# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CLYDE C. McGUIRE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:16-cv-1319-MHH** |
| | } | |
| **G4S SECURE SOLUTIONS,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

In this employment discrimination action, plaintiff Clyde C. McGuire claims that his former employer, defendant G4S Secure Solutions or G4S, discriminated and retaliated against him on the basis of his race in violation of Title VII and 42 U.S.C. § 1981.  Mr. McGuire is African-American.  He contends that G4S paid him less than a similarly-situated Caucasian employee who held the same position as Mr. McGuire and had less experience than Mr. McGuire.  Mr. McGuire also alleges that G4S suspended him and ultimately terminated his employment in retaliation for his complaints about discriminatory pay.

G4S has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 19).  The company argues that it is entitled to judgment as a matter of law on all of Mr. McGuire's claims.  For the reasons stated

below, the Court grants summary judgment with respect to Mr. McGuire's pay discrimination claim and denies summary judgment with respect to Mr. McGuire's retaliation claim.

## I.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).  The Court presents the evidence in this opinion accordingly.

"If the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp Art, Inc. v. U.S. Postal Service,* 456 F.3d 1270, 1274 (11th Cir. 2006).

## II.    FACTUAL BACKGROUND

G4S provides security-related products and services to its clients.    The products and services include risk consulting and investigations, systems integration, security software and technology, and security officers. (Doc. 18-46, ¶ 2).  G4S divides its national operations by region and by local offices.  (Doc. 18-46, ¶ 3).  One of G4S's local offices is located in Birmingham, Alabama.  (Doc. 18-46, ¶ 3).  G4S has a satellite office in Huntsville, Alabama.

In January 2015, Mr. McGuire applied for a field supervisor position at G4S's Birmingham, Alabama office.  (Doc. 18-2, p. 12; Doc. 18-46, ¶ 4).  Area supervisors Leslie Vandiver and Tyler Gray interviewed Mr. McGuire.  (Doc. 18-2, pp. 12-14; Doc. 18-3, p. 51).  Mr. McGuire did not get the job because G4S already had hired someone for the field supervisor position, but Ms. Vandiver and Mr. Gray were so impressed with Mr. McGuire's experience that they suggested he speak to operations manager Bob Kincaid and general manager Jacob Pugh.  (Doc. 18-2, pp. 14-15).  Mr. Pugh told Mr. McGuire that G4S would keep his (Mr.

McGuire's) resume on file and call him if another position became available. (Doc. 18-2, p. 15; Doc. 18-46, ¶ 4).

In April 2015, Mr. Kincaid and Mr. Pugh called Mr. McGuire and told him that G4S had an opening for an area supervisor position. (Doc. 18-2, pp. 15-16; Doc. 18-46, ¶ 5). Mr. Kincaid and Mr. Pugh interviewed Mr. McGuire and hired him for the position. (Doc. 18-2, p. 16). When he started the job on May 13, 2015, G4S set Mr. McGuire's salary at $33,000 per year. (Doc. 18-2, pp. 39-40; *see also* Doc. 18-13, p. 1).[1] Mr. McGuire tried to negotiate a higher salary, but Mr. Kincaid told Mr. McGuire that G4S "didn't have any wiggle room, but we would look at it [again] maybe after 90 days or 120 days." (Doc. 18-2, p. 22). Mr. McGuire did not receive a raise while he worked for G4S. (Doc. 18-2, p. 39).

As an area supervisor, Mr. McGuire managed between 150 and 200 G4S security officers assigned to between 12 and 18 client sites across the state of Alabama. (Doc. 18-2, pp. 23, 47-48; Doc. 18-46, ¶ 6). Mr. McGuire was responsible for payroll, scheduling, hiring officers at his sites, visiting the client sites, and providing training to site officers and site supervisors. (Doc. 18-2, p. 23). Mr. McGuire understood that a good area supervisor is "[s]omeone that's

---

[1] In his affidavit, Mr. Pugh stated that Mr. McGuire's annual salary was $35,000 per year. (Doc. 18-46, ¶ 14). Mr. McGuire testified that his salary was $33,000 per year, and Mr. McGuire's new hire form states that his annual pay rate is $33,000. (Doc. 18-2, pp. 39-40; *see also* Doc. 18-13, p. 1). In addition, G4S's response to Mr. McGuire's EEOC charge states that Mr. McGuire's annual pay rate was $33,000 per year. (Doc. 18-47, p. 3). Therefore, viewing the evidence in the light most favorable to Mr. McGuire, the Court accepts that Mr. McGuire's annual salary was $33,000.

attentive to the customers' needs, the officers' needs. Someone that understands the business and how . . . it runs. . . . Someone that's professional." (Doc. 18-2, pp. 26-27).

Nearly three months after G4S hired Mr. McGuire, the company hired Matthew McDonald as an area supervisor in the Huntsville, Alabama office. (Doc. 18-46, ¶ 12). Mr. McDonald is Caucasian. (Doc. 18-46, ¶ 12). On August 12, 2015, a Wednesday, Mr. McGuire picked up Mr. McDonald's new hire paperwork from a shared printer. (Doc. 18-3, pp. 19, 39; Doc. 18-46, ¶ 16). Mr. McGuire learned that G4S offered to pay Mr. McDonald $37,440 per year, $4,440 more than Mr. McGuire's annual salary for the same position. (Doc. 18-3, p. 40; Doc. 18-46, ¶ 14; *see also* Doc. 18-13, p. 1; Doc. 18-26, p. 1).[2]

The following day, Mr. McGuire asked Mr. Pugh "why [Mr. McDonald] was getting offered more money for the same position when I had asked for that same salary or higher." (Doc. 18-3, p. 19; *see also* Doc. 18-3, pp. 39-41). Mr. Pugh told Mr. McGuire that G4S set Mr. McDonald's salary in part based on Economic Research Institute or ESI salary assessor data for jobs located in the Huntsville, Alabama market. (Doc. 18-3, pp. 40-41; Doc. 18-25; Doc. 18-46, ¶¶

---

[2] G4S contends that the difference between Mr. McDonald's and Mr. McGuire's salary is $2,440. (Doc. 19, p. 7). Mr. McGuire's brief also refers to a $2,440 pay difference. (Doc. 22, pp. 18, 20). Mr. McGuire testified that his salary was $33,000 per year, and Mr. McGuire's new hire form states that his annual pay rate is $33,000. (Doc. 18-2, pp. 39-40; *see also* Doc. 18-13, p. 1). Mr. McDonald's annual salary was $37,440. (Doc. 18-46, ¶ 14).

13-14). Mr. Pugh explained that "based on the Huntsville area and the market . . . they needed to have a higher salary to get a better quality candidate." (Doc. 18-3, p. 40). Based on Google research, Mr. McGuire believes that the cost of living in Birmingham and Huntsville is "pretty much the same." (Doc. 18-3, p. 42).

Mr. Pugh also told Mr. McGuire that G4S paid more money to Mr. McDonald because the Huntsville area supervisor "does not have overhead assistance readily available" like the area supervisors in Birmingham. (Doc. 18-46, ¶ 14; *see also* Doc. 18-3, p. 43). According to Mr. McGuire, the Huntsville area supervisor "did have support" because "any time that he needed anything, he'd call down and talk with HR, talk with ops, talk with payroll, and they would take care of things . . . for that office." (Doc. 18-3, p. 43). After Mr. McGuire questioned Mr. Pugh about the pay difference, Mr. Pugh said that "he would talk to his boss and see what he could do about [Mr. McGuire's] pay." (Doc. 18-3, p. 44).

The record shows that in the six days following Mr. McGuire's inquiry about the salary discrepancy, five G4S employees who Mr. McGuire supervised submitted complaints about him. At least one of the complaints seems to have been solicited. According to Mr. McGuire, these were the first complaints that G4S employees made about him.[3]

---

[3] The record indicates that the day before Mr. McGuire asked Mr. Pugh about the salary discrepancy, security officer Kamia Wright submitted a written complaint against Mr. McGuire. (Doc. 18-17, p. 1). In her complaint, Ms. Wright stated that she had "had issues with [her]

The day after Mr. McGuire asked Mr. Pugh about the salary discrepancy, Mr. Pugh spent the "whole day" in Angela Warf's office. (Doc. 18-3, p. 20; *see* Doc. 18-3, p. 57). Ms. Warf is the human resources manager in G4S's Birmingham office. (Doc. 18-2, p. 59). Ms. Vandiver told Mr. McGuire that Mr. Pugh and Ms. Warf probably were "in a closed-door meeting about" Mr. McGuire and that Mr. McGuire probably would be "terminated or suspended because [he] questioned [Mr. Pugh] about the guy in Huntsville." (Doc. 18-3, p. 58).

In an undated written statement, Rick Bailes, a G4S site supervisor at DCH Hospital in Tuscaloosa, Alabama, reported events regarding a phone conversation that he had with Mr. McGuire the morning after Mr. McGuire asked Mr. Pugh about the salary discrepancy. (Doc. 18-18, p. 1; Doc. 18-46, ¶ 20). Mr. Bailes stated that Mr. McGuire had been "very rude and uncooperative" and "had a very bade attitude" during the phone call. (Doc. 18-18, p. 1). When Mr. Bailes saw Mr.

schedule and with communications with [Mr. McGuire] since his time of arrival." (Doc. 18-17, p. 1). Ms. Wright explained that she had tried to contact Mr. McGuire on several occasions regarding safety concerns about a specific site, but Mr. McGuire did not respond to text messages or phone calls. (Doc. 18-17, p. 1). Ms. Wright stated that other security officers also had trouble contacting Mr. McGuire about their schedules. (Doc. 18-17, p. 1). Ms. Wright stated that she thought that Mr. McGuire was "a bad representation of the company." (Doc. 18-17, p. 1). Until his deposition, Mr. McGuire had not seen Ms. Wright's statement. (Doc. 18-2, p. 51). Mr. McGuire testified that he believed that it was appropriate for him to assign Ms. Wright to the site in question. According to Mr. McGuire, he would not assign an officer to an unsafe post, and as a flex officer, Ms. Wright was "required to work any shift at any time in any location that [she was] qualified to work at." (Doc. 18-2, pp. 52-53; *see also* Doc. 18-2, pp. 55-56). Mr. McGuire testified that he was out of town when Ms. Wright tried to contact him regarding the schedule and that Ms. Wright could have reached out to Ms. Vandiver with questions or concerns. (Doc. 18-2, pp. 53-54).

McGuire at the Birmingham office later in the day, Mr. McGuire accused Mr. Bailes of being rude. (Doc. 18-18, p. 1). Mr. Bailes apologized for the misunderstanding, and Mr. McGuire walked away without saying anything. (Doc. 18-18, p. 1). In his written statement, Mr. Bailes expressed concern that Mr. McGuire's "poor attitude and unprofessionalism" could "affect [G4S's] clients." (Doc. 18-18, p. 1). Until his deposition, Mr. McGuire had not seen Mr. Bailes's statement. (Doc. 18-2, p. 61).

On August 17, 2015, two G4S employees corresponded with G4S about Mr. McGuire. William DelGrosso, a site supervisor for G4S at Alagasco, wrote Mr. Pugh a letter. (Doc. 18-19). The subject line of the letter is "Repeated Disciplinary Write-ups by Area Supervisor Clyde McGuire." (Doc. 18-19, p. 1). The letter explains that Mr. DelGrosso had made Mr. Pugh aware of an employee complaint about Mr. McGuire, and Mr. DelGrosso believed that Mr. McGuire disciplined him (Mr. DelGrosso) in retaliation for forwarding the complaint to management. (Doc. 18-19, p. 1). Mr. DelGrosso questioned whether it was "[Mr. McGuire]'s way or the highway," and Mr. DelGrosso stated that Mr. McGuire "cannot mask his feelings when he is unhappy." (Doc. 18-19, p. 2).

Natalie Bullock, a G4S security officer who worked at Alagasco, sent an email to Ms. Warf on August 17, 2015. (Doc. 18-20). In her email, Ms. Bullock stated that on July 31, 2015, Mr. McGuire contacted her and told her that she

should have worked the third shift alone on July 30, 2015. (Doc. 18-20, p. 1). Ms. Bullock told Mr. McGuire that she did not know that she was supposed to work the shift alone because Mr. McGuire did not "inform [her] of this during [her] time in the office when [she] was getting her schedule." (Doc. 18-20, p. 1). Ms. Bullock's letter documents other scheduling misunderstandings between she and Mr. McGuire that occurred between July 31, 2015 and the middle of August 11, 2015. (Doc. 18-20, pp. 1-2). Ms. Bullock explained that during one of their conversations in early August, Mr. McGuire was "highly unprofessional and hostile." (Doc. 18-20, p. 1).

On August 19, 2015, John Chandler, a site supervisor for G4S at St. Vincent's Hospital, sent an email to Mr. Pugh. (Doc. 18-22).[4] The email begins with the following statement: "You asked me if I had any issues with [Mr. McGuire] while serving as the Site Supervisor at St. Vincent's." (Doc. 18-22, p. 1). Mr. Chandler's email continues:

> I feel that [Mr. McGuire] does not communicate well with me. I do not know if it is an issue of he does not read his emails or that he does not grasp what you are telling him. He does become rather aggressive if you question him about communication issues.

_____

[4] When Mr. McGuire was deposed on February 8, 2017, Mr. Chandler was the operations manager for G4S. When Mr. Chandler submitted his August 19, 2015 email to Mr. Pugh, Mr. Chandler was the site supervisor for G4S employees at St. Vincent's Hospital. (Doc. 18-2, p. 81).

(Doc. 18-22, p. 1). Mr. Chandler's email documents four specific examples of "issues" that he had had with Mr. McGuire. (Doc. 18-22, p. 1). Mr. Chandler noted that "it has been frustrating working with [Mr. McGuire] these past few months." (Doc. 18-22, p. 1).

On August 19, 2015, Burl Murrell, a G4S security officer, spoke with Ms. Warf and informed her of "2 separate incidents regarding the way he was treated by [Mr.] McGuire." (Doc. 18-23). Mr. Murrell reported that Mr. McGuire was "very rude" on two separate occasions when Mr. Murrell requested time off from work. (Doc. 18-23, p. 1).

While this flurry of complaints amassed, on August 17, 2015, Mr. Kincaid called Mr. McGuire and asked him to come to Mr. Pugh's office for a meeting. (Doc. 18-3, pp. 20, 56). During the meeting, Mr. Kincaid, Mr. Pugh, and Ms. Warf told Mr. McGuire that G4S was suspending him with pay pending an investigation into employee complaints that Mr. McGuire had been rude to them. (Doc. 18-3, pp. 15, 20, 54-56; Doc. 18-47, p. 4). Mr. Kincaid, Mr. Pugh, and Ms. Warf did not show Mr. McGuire documentation or evidence of the employee complaints during the meeting on August 17, 2015. (Doc. 18-3, p. 15).[5]

---

[5] Mr. McGuire has offered uncontradicted testimony that he did not see a number of the complaints until his deposition. (Doc. 18-2, pp. 65, 72; Doc. 18-3, p. 7). Mr. McGuire challenges the merits of a number of the complaints. (Doc. 18-2, pp. 73-75; Doc. 18-3, pp. 3-4, 9-10).

After his meeting with Mr. Kincaid, Mr. Pugh, and Ms. Warf, Mr. McGuire filed an EEOC charge alleging race discrimination and retaliation. (Doc. 18-30, p. 1). The charge is dated August 17, 2015. (Doc. 18-30, p. 1). After his suspension, Mr. McGuire tried to call G4S's Vice President of Diversity and Inclusion Pattie Marmon. (Doc. 18-4, p. 69; Doc. 18-21, p. 2). Mr. McGuire left three or four messages for Ms. Marmon, but she did not return his calls. (Doc. 18-4, p. 67).

On August 18, 2015, Mr. McGuire called G4S's employee concerns hotline and spoke with Violet Taylor. (Doc. 18-2, p. 45).[6] Mr. McGuire told Ms. Taylor that he believed his suspension was related to his discussion with Mr. Pugh about Mr. McDonald's salary. (Doc. 18-2, p. 46). Mr. McGuire explained to Ms. Taylor that he had not heard about the employee complaints against him until he asked Mr. Pugh about Mr. McDonald's salary. (Doc. 18-2, p. 46). Ms. Taylor told Mr. McGuire that she would ask Mr. Pugh and Mr. Kincaid about the situation. (Doc. 18-2, p. 46). Mr. McGuire did not hear back from Ms. Taylor. (Doc. 18-2, p. 47). Mr. McGuire tried to call Ms. Taylor "two or three times to find out if she had [heard] anything back," but Ms. Taylor did not return Mr. McGuire's calls. (Doc. 18-2, p. 47).

---

[6] The record does not contain information regarding Ms. Taylor's title, but it appears that she worked in G4S's corporate human resources office.

G4S opened a case file concerning Mr. McGuire's hotline complaint. (Doc.

18-21). The case summary contains an August 17, 2015 entry from Ms. Marmon

to Ms. Taylor. (Doc. 18-21, p. 3). The entry reads:

> Hi Violet, This is in follow-up to my voicemail. I have something of a conundrum in Birmingham. On Friday, Jacob Pugh and Angie Warf attempted to contact me regarding an "issue" with a relatively new supervisor, Clyde McGuire. Since I was out of the office they spoke with Melinda. Jacob advised Melinda (and later me) that Clyde is outstanding at his job duties but has an "attitude problem" and that he is rude to his subordinates, rude to the HR Manager Angie, and generally causing dissension in the office. [Mr. Pugh] was weighing whether or not to terminate [Mr. McGuire], since he was new or to put him on a performance improvement plan. When I spoke with Jacob today I gave him a third option. I said since he has been receiving complaints about Clyde, he should consider placing him on paid administrative leave for a few days while he looks into the employee complaints as that is typically our general practice. Jacob chose this option. After he suspended Clyde, Jacob sent me the email below. In the interim Clyde has contacted me and I just got off the phone with him. He feels very strongly that Jacob suspended him in retaliation for having brought what he felt like was a pay disparity to his attention. He also felt it was unfair to be suspended when he did not even know what he did wrong, and further claimed that about three weeks ago Jacob mentioned he had received a complaint about Clyde's manner, but at the time Jacob brushed it off saying he understood that was just Clyde's way of talking. He feels that Jacob is bringing up old stuff as an excuse to suspend him. I'd really like another set of eyes on this. Also, since Clyde has mentioned the pay issue to me as well I think it belongs in the Honor system. Clyde's number is []. I've left a message for Jacob to call me and I plan to tell him that Clyde has stated this concern so it will be assigned to the Honor system. Thank you, Patti.

(Doc. 18-21, p. 3).

The email from Mr. Pugh to which Ms. Mormon referred in her message to

Ms. Taylor is dated August 17, 2015. The message states:

> We spoke with [Mr. McGuire]. It went about as expected. He disagrees that he has an attitude problem and that it's everyone else's fault.
>
> Early last week he found out what another supervisor's pay was. He saw a 222A form on the printer about the pay and he confronted me. The other supervisor operates a satellite office in another part of the state, the pay is justified based on the ERI. [Mr. McGuire] feels that this whole thing is in retaliation of him confronting me. That may be why he wanted to talk to you.

(Doc. 18-21, p. 1).

The case summary regarding Mr. McGuire's hotline complaint contains an

August 18, 2015 message to Ms. Taylor. (Doc. 18-21, p. 3). The message is

marked "CONFIDENTIAL." The message reads:

> Hi Violet. This is to notify you that we have received a complaint via the Employment Concerns Hotline (ECH). We have guaranteed the complainant that his or her confidentiality will be respected by all parties and that there will be no retaliation. G4S requires that you conduct a fact finding review of this complaint, even if the complaint was anonymous. Further, you must submit your findings to Corporate Human Resources prior [to] September 8, 2015. (Note: Persons who have been named in the complaint must not conduct this review.) Upon conclusion of your review of the complaint, please prepare and submit a report with the following information: - A summary of what you learned from your interview of the person who made the complaint and of each person named in the complaint (Note: Use your own judgment relative to if you should conduct an in-person or phone interview. It is highly recommended, however, that the interview of the complainant be made in person.) - Any documents obtained - Any corrective action you will take to lessen the likelihood of this happening again. Please also notify me directly if you are

> unable to conclude your review on or before the scheduled [] date, as all over due cases are reported to Senior Management.

(Doc. 18-21, p. 3).

On August 20, 2015, Mr. Kincaid contacted Mr. McGuire and asked him to come to the office the following day. (Doc. 18-3, pp. 13-14, 17). When Mr. McGuire arrived at the office, he met with Mr. Kincaid, Mr. Pugh, and Ms. Warf. (Doc. 18-3, pp. 13, 17). Mr. Kincaid, Mr. Pugh, and Ms. Warf gave Mr. McGuire a copy of an Employee Disciplinary/Corrective Action Notice. (Doc. 18-24, p. 1). The document is not signed, but it is dated August 21, 2015. (Doc. 18-24, p. 1). Under a section of the document titled "Type of Action," the box labeled "discharge" is checked. (Doc. 18-24, p. 1). Under the section of the document titled "Corrective Steps Required," the document states "To be terminated." (Doc. 18-24, p. 1). The form also contains a section titled "Reason(s) For Disciplinary Action," which states:

> Mr. McGuire has displayed an unacceptable attitude towards co-workers, site supervisors, and employees. He is argumentative and disrespectful in his tone, words, and body language. We have received numerous complaints from sites, employees, and coworkers pertaining to these facts, as well as such instances have been witnessed by management. His conduct has been insubordinate and disrespectful which are grounds for immediate termination. Other specific unprofessional acts: failing to notify an officer of the flex schedule after being direct[ed] by GM to do so, disrespectful attitude and lack of engagement during staff meetings (i.e. not talking and turning back), threatening officers of not approving days off unless they work overtime, rudely hanging up on officers during

conversations, walking off from a supervisor who was apologizing for a misunderstanding, etc.

(Doc. 18-24, p. 1).[7]

Under a section of the form titled "Supervisor's Remarks," the document states that "[m]anagement has received 6 documented complaints about Mr. McGuire's disrespectful attitude. In addition management has witnessed several occurrences listed above and even spoke with Mr. McGuire about his attitude on Thursday July 30, 2015." (Doc. 18-24, p. 1). During the August 21, 2015 meeting, Mr. Pugh showed Mr. McGuire some of the employee complaints typed on G4S letterhead, but Mr. McGuire "never got a chance to read them." (Doc. 18-3, p. 14).

Mr. McGuire told Mr. Kincaid, Mr. Pugh, and Ms. Warf that he did not feel that he was disrespectful and argumentative. (Doc. 18-3, pp. 17, 20). Mr. McGuire believes that the allegations contained on the form are unfair because he

---

[7] The G4S Birmingham office conducts weekly staff meetings for overhead staff, including area supervisors. (Doc. 18-3, p. 30; Doc. 18-46, ¶ 10). Mr. Pugh testified that during these meetings, Mr. McGuire was disrespectful and disengaged and had a poor attitude. (Doc. 18-46, ¶ 10). For example, according to Mr. Pugh, Mr. McGuire would turn his chair away from other staff while they were speaking, and Mr. McGuire did not meaningfully participate in the meetings. (Doc. 18-46, ¶ 11). Mr. Pugh testified that Mr. McGuire would sit silently during the meetings with a bored and disgusted look on his face. (Doc. 18-46, ¶ 11). Mr. Pugh testified that on July 20, 2015, he counseled Mr. McGuire regarding this behavior. (Doc. 18-46, ¶ 12). Mr. McGuire does not recall the July 20, 2015 counseling. (Doc. 18-3, p. 30). Mr. McGuire testified that he was engaged in staff meetings and "didn't turn [his] back to anyone" during staff meetings except to look at presentations on a screen. (Doc. 18-3, p. 34; *see also* Doc. 18-3, pp. 33-35). Mr. McGuire also testified that he was not disrespectful, and he did not have a negative attitude during staff meetings. (Doc. 18-3, p. 31).

did not see the employee complaints and "was never given a chance to give [his] side of the story of any of the complaints." (Doc. 18-3, p. 21).

Although the disciplinary/corrective action notice recommended termination, Mr. Kincaid, Mr. Pugh, and Ms. Warf instructed Mr. McGuire to return to work on Monday, August 24, 2015. (Doc. 18-3, p. 15). Mr. Kincaid, Mr. Pugh, and Ms. Warf told Mr. McGuire that he "need[ed] to be careful how [he] talk[ed] to people." (Doc. 18-3, p. 22). Mr. McGuire explained that he had not been rude and apologized if his tone had been negative, but Mr. McGuire believed that he was "just coming across with a tone of being authoritative and letting [his] employees] know how [he] feel[s] and what [they] need to be doing." (Doc. 18-3, p. 22). After Mr. McGuire came back to work, on more than one occasion, Mr. Pugh told Mr. McGuire that he (Mr. Pugh) was surprised by Mr. McGuire's pleasant attitude. (Doc. 18-3, p. 64; Doc. 18-6, p. 6). Mr. Pugh also told Mr. McGuire that he thought he (Mr. McGuire) would return to work "with an angry black man attitude, and I had planned to fire you." (Doc. 18-3, p. 65; *see also* Doc. 18-6, p. 6).[8]

On the day Mr. McGuire returned to work, as part of her investigation into Mr. McGuire's hotline complaint, Ms. Taylor interviewed Mr. McGuire and Mr.

---

[8] Mr. Pugh denies making this comment. (Doc. 18-46, ¶ 31). Construing the evidence in the light most favorable to Mr. McGuire, the Court accepts as true Mr. McGuire's testimony on this point.

Pugh separately. (Doc. 18-21, p. 4). Ms. Taylor's notes do not reflect whether she met with Mr. McGuire and Mr. Pugh in person or whether she spoke with them over the telephone. According to the case summary notes, Mr. McGuire told Ms. Taylor that he expected to receive "similar, if not, more pay [than Mr. McDonald]." (Doc. 18-21, p. 4). Ms. Taylor's August 24, 2015 notes state that she was "[a]waiting call back from GM to discuss the expected resolution." (Doc. 18-21, p. 4).

On August 26, 2015, G4S security officer Rolando Rogers called G4S's employee concerns hotline and accused Mr. McGuire of "targeting him." (Doc. 18-33, p. 1). Mr. Rogers stated that Mr. McGuire "constantly denied [Mr. Rogers's] requests for time off." (Doc. 18-33, p. 1). Mr. Rogers stated that this practice had been going on for several weeks. (Doc. 18-33, p. 2). Mr. Rogers indicated that he was not reporting this complaint to Mr. McGuire directly because Mr. Rogers feared retaliation. (Doc. 18-33, p. 2). The case summary report for Mr. Rogers's complaint does not contain a section with management's findings regarding his complaint. Therefore, it is unclear whether management investigated Mr. Rogers's complaint. (*See generally* Doc. 18-33).

On September 1, 2015, one week after Mr. McGuire returned from his suspension, Mr. Pugh placed Mr. McGuire on a 90-day performance improvement plan or PIP. (Doc. 18-34, pp. 1-2). The PIP states:

> Your performance is well below the company's goals and personal standards that have been given to you for the current year. This will serve as your official notification that you are being placed on a Performance Improvement Plan ("PIP") and should you fail to meet the objectives outlined for you in this PIP as well as fail to continue to show progress in the needed action steps that your employment will be terminated at any time during the 90 day period.
>
> During the review period beginning September 1, 2015, your progress against stated objectives will be measured in two week interim periods. I [Mr. Pugh] will be working with you every two weeks to discuss your progress and or lack of progress.

(Doc. 18-34, p. 1).

According to the PIP, Mr. McGuire's strengths included productivity, organization, and job knowledge, and Mr. McGuire's weaknesses included communication, respect for others, engagement, and attitude. (Doc. 18-34, p. 1). Mr. Pugh told Mr. McGuire that G4S would fire him if he did not sign the PIP. (Doc. 18-3, pp. 76-77). Mr. McGuire and Mr. Pugh signed the PIP, and Mr. McGuire acknowledged that he could "be subject to further discipline up to and including termination of [his] employment with G4S" if he did not "perform in a satisfactory manner within the PIP period." (Doc. 18-34, p. 2).

A September 24, 2015 entry in the case summary concerning Mr. McGuire's hotline complaint states:

> Vice President of Diversity and Inclusion, Patricia B. Marmon, worked closely on this investigation. Based on the outcome of the investigation, we found no evidence to support that [Mr. McGuire] was suspended in retaliation of his question surrounding pay rate.

This was explained to [Mr. McGuire] during a meeting with his general manager. We agreed that the complainant was reassigned at the offered salary, and an increase will not be provided to match or exceed that of the other area supervisor in another city. Also, further information in this regard was not warranted.

(Doc. 18-21, p. 2). Another September 24, 2015 entry on the case summary states, "Invalid complaint – The allegations are unfounded." (Doc. 18-21, p. 2). Neither Ms. Taylor nor anyone else at G4S told Mr. McGuire about the outcome of the investigation. (Doc. 18-2, pp. 79-80). No one held the required bi-weekly PIP meetings with Mr. McGuire in September 2015.

On October 20, 2015, Ms. Marmon, on behalf of G4S, officially responded to Mr. McGuire's August 17, 2015 EEOC charge. (Doc. 18-47). In her letter to the EEOC, Ms. Marmon explained that G4S believed that "Mr. McGuire's claim of discrimination and retaliation is not supported by facts." (Doc. 18-47, p. 4). On October 21, 2015, Ms. Warf's electronic signature was placed on an employment action form which states that G4S was terminating Mr. McGuire's employment. G4S did not complete the termination at that time. No one held the required bi-weekly PIP meetings with Mr. McGuire in October 2015.

Between October 23, 2015 and December 16, 2015, seven more G4S employees complained to G4S management about Mr. McGuire.[9] These

---

[9] G4S received complaints on October 23, 2015, November 12, 2015, November 18, 2015, December 8, 2015, December 11, 2015, December 14, 2015, and December 16, 2015. (Doc. 18-35; Doc. 18-36; Doc. 18-37; Doc. 18-38; Doc. 18-39; Doc. 18-40, p. 1; Doc. 18-42).

employees complained about Mr. McGuire's communication with and attitude toward employees. The complaints also concern Mr. McGuire's scheduling of employees and alleged alterations to time records. (Doc. 18-35; Doc. 18-36; Doc. 18-37; Doc. 18-38; Doc. 18-39; Doc. 18-40, p. 1; Doc. 18-42).[10] There is no evidence that G4S conducted bi-weekly PIP meetings with Mr. McGuire during November 2015 or that the company brought the seven complaints to Mr. McGuire's attention. (Doc. 18-4, p. 55). Mr. McGuire's PIP expired on December 1, 2015.

On December 18, 2015, Mr. Pugh and Ms. Warf told Mr. McGuire that they were terminating his employment with G4S. (Doc. 18-4, p. 57). According to Mr. Pugh, G4S fired Mr. McGuire because of Mr. McGuire's "continued inappropriate and unprofessional behavior in managing his subordinates and interacting with his peers." (Doc. 18-46, ¶ 39). Mr. McGuire testified that Mr. Pugh told him that the company "had [received] some employee complaints." (Doc. 18-4, p. 55). (Doc. 18-4, p. 55). Mr. McGuire was "caught off guard" and "didn't know why [he] was being terminated." (Doc. 18-4, p. 56). When Mr. McGuire asked Mr. Pugh why G4S was firing him, Mr. Pugh responded that Mr. McGuire would "need to speak with HR." (Doc. 18-4, p. 57). After his termination, Mr. McGuire called Ms.

---

[10] Mr. McGuire disputes the merits of many of these complaints. (Doc. 18-4, pp. 14, 17).

Marmon three or four times.  (Doc. 18-4, p. 69).  Ms. Marmon did not respond to Mr. McGuire's messages.  (Doc. 18-4, p. 69).

The personnel action change form relating to Mr. McGuire's termination states that his termination was effective December 19, 2015.  (Doc. 18-43).  The form states that December 18, 2015 was the last day that Mr. McGuire worked for G4S.  (Doc. 18-43, p. 1).  Mr. Pugh signed the form on December 29, 2015.  (Doc. 18-43, p. 1).  Ms. Warf's electronic signature on the form is dated October 21, 2015.  (Doc. 18-43, p. 1).

After G4S terminated Mr. McGuire's employment, Mr. Pugh testified that he learned that Mr. McGuire provided incorrect information on his job application.  (Doc. 18-46, ¶ 41).  The personal information form that Mr. McGuire completed states that he has an Associate's Degree.  (Doc. 18-2, p. 16; Doc. 18-9, p. 2).  Mr. McGuire does not have an Associate's Degree.  (Doc. 18-2, p. 18).  Mr. McGuire does not know what happened, but he stated that he did not intentionally misrepresent the information.  (Doc. 18-2, p. 18).

Also after G4S terminated Mr. McGuire's employment, Mr. Pugh testified that he learned that Mr. McGuire falsified a mileage report.  (Doc. 18-46, ¶ 42).  Mr. Pugh bases this conclusion on a mileage report for September 9, 2015 in which Mr. McGuire sought reimbursement for a 324-mile trip to Sabic Plastics which is located outside of Montgomery, Alabama near Selma, Alabama.  (Doc. 18-2, p. 34;

Doc. 18-4, pp. 81-84; Doc. 18-48, p. 3). Mr. McGuire denies falsifying his mileage reports when he worked for G4S. (Doc. 18-4, p. 81). Mr. Pugh testified that had he been aware of Mr. McGuire's falsified application or mileage report, then he (Mr. Pugh) would have terminated Mr. McGuire's employment before December 18, 2015. (Doc. 18-46, ¶ 45).

## III. ANALYSIS

Mr. McGuire asserts Title VII and § 1981 race discrimination and retaliation claims against G4S. Mr. McGuire contends that G4S discriminated against him on the basis of his race by not paying him for his work as an area supervisor the same salary that G4S paid Mr. McDonald, a Caucasian area supervisor. Mr. McGuire also contends that G4S retaliated against him for complaining about discriminatory pay by suspending him and then terminating his employment. The Court analyzes Mr. McGuire's Title VII and § 1981 discrimination and retaliation claims under the same framework. *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) ("This Circuit has routinely and systematically grouped Title VII and § 1981 claims for analytic purposes.") (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

Mr. McGuire's claims will survive G4S's motion for summary judgment if Mr. McGuire has identified disputed, material evidence regarding discriminatory or retaliatory intent. Where, as here, a plaintiff relies on circumstantial evidence to

establish discriminatory or retaliatory intent, a district court may use the *McDonnell Douglas* analytical framework to evaluate the sufficiency of the plaintiff's evidence. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016); *Flowers v. Troup Cty., Ga. School Dist.*, 803 F.3d 1327, 1335-36 (11th Cir. 2015).[11] Under this burden-shifting framework, "a plaintiff first must make out a prima facie case of discrimination that 'in effect creates a presumption that the employer unlawfully discriminated [or retaliated] against the employee.'" *Flowers*, 803 F.3d at 1336 (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) ("More than one formulation of the elements of a prima facie case exist.").

If a plaintiff presents a prima facie case, then the burden shifts to the defendant to articulate a non-discriminatory or non-retaliatory basis for the employment action at issue. If the defendant carries this light burden, then the

---

[11] A plaintiff may establish discriminatory intent by using direct, circumstantial, or statistical evidence. "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (citation omitted). When a plaintiff relies on direct evidence of discriminatory intent, a district court does not have to engage in the *McDonnell Douglas* burden shifting analysis. Mr. McGuire does not argue that he can establish discriminatory intent using direct evidence.

burden returns to the plaintiff to prove that the defendant's stated reason for its conduct is pretext for intentional discrimination or retaliation. *Furcron*, 843 F.3d at 1310; *Flowers*, 803 F.3d at 1336.

"'[T]he *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII cases." *Flowers*, 803 F.3d at 1336 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "The critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers*, 803 F.3d at 1336 (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328). "Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'" *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328).

## A. Discriminatory Pay

"To state a prima facie case for intentional discrimination in compensation, a plaintiff must establish that (1) []he belongs to a protected racial minority; (2) []he received low wages; (3) similarly situated comparators outside the protected class received higher wages; and (4) []he was qualified to do the job." *Cooper v.*

*Southern Co.*, 390 F.3d 695, 734-35 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006).

For purposes of this opinion, the Court assumes without deciding that Mr. McGuire has established a prima facie case of discriminatory pay.[12] G4S acknowledges that it paid Mr. McDonald $4,440 more per year than G4S paid Mr. McGuire, but G4S explains that it do so because of differences in the Huntsville and Birmingham job markets and because Mr. McDonald did not have readily

---

[12] G4S argues that Mr. McGuire has not demonstrated that he was qualified for the area supervisor position. (Doc. 19, pp. 14-15). To support its position, G4S relies on *Daniels v. Hale*, 350 Fed. Appx. 380 (11th Cir. 2009), an unpublished Eleventh Circuit panel decision. In *Daniels*, the plaintiff did not establish a prima facie case of Title VII race discrimination because she did not demonstrate that she was qualified for her position. *Daniels*, 350 Fed. Appx. at 385. In reaching this conclusion, the panel noted that after the defendant deemed the plaintiff qualified for her position, "subsequent objective evaluations of [her] performance from numerous witnesses indicate that she had difficulty communicating and handling calls, which were skills required [for the relevant position], and that she received continuing complaints about her performance." *Daniels*, 350 Fed. Appx. at 385.

*Daniels* is not binding authority because it is an unpublished opinion. *See United States. v. Rodriguez-Lopez*, 363 F.3d 1134, 1138 n.4 (11th Cir. 2004) ("While unpublished opinions are not binding on this court, they may nonetheless be cited as persuasive authority."); *see also* 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."). *Daniels* is not persuasive authority under the circumstances of this case because unlike the record in *Daniels*, the record here does not contain "objective evaluations" from which the Court can determine that Mr. McGuire lacked the minimum skill set necessary to perform his job as area supervisor. Even if *Daniels* were persuasive, G4S relies on *Daniels* to support its argument that Mr. McGuire's "performance with G4S was unsatisfactory at the time of his termination." (Doc. 19, p. 15). G4S does not argue that Mr. McGuire was unqualified when G4S hired him and set his compensation. Nor could G4S make such an argument based on the summary judgment record which indicates that G4S area supervisors were so impressed with Mr. McGuire's experience that even though the initial position for which he applied no longer was available, G4S employees arranged for Mr. McGuire to meet with company executives who kept Mr. McGuire's resume on file. These executives then recruited Mr. McGuire for the area supervisor position several months later. (Doc. 18-2, pp. 14-16). In addition, the record contains evidence that Mr. Pugh believed that Mr. McGuire was "outstanding at his job duties." (Doc. 18-21, p. 3). Viewing the evidence in the light most favorable to Mr. McGuire, these facts distinguish this case from the facts in *Daniels*.

accessible overhead support in Huntsville. (Doc. 18-46, ¶¶ 13-14, 16). These are non-discriminatory reasons for paying Mr. McDonald a higher salary. Therefore, to survive summary judgment, Mr. McGuire must show that G4S's proffered explanation for the pay discrepancy "is false, and that discrimination was the real reason for the adverse action." *King v. Ferguson Enters., Inc.*, 568 Fed. Appx. 686, 689 (11th Cir. 2014) (citing *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006)).

Mr. McGuire disputes G4S's proffered reasons for the pay discrepancy. First, Mr. McGuire argues that based on his independent research, the cost of living in Huntsville and Birmingham is "pretty much the same." (Doc. 18-3, pp. 42-43). Second, Mr. McGuire testified that Mr. McDonald had the same access to overhead support as Birmingham-based area supervisors. (Doc. 18-3, p. 43).

Assuming for purposes of summary judgment that Mr. McGuire's testimony demonstrates that G4S's reasons for paying him $4,440 less per year than Mr. McDonald are false, this evidence, without more, does not "suggest a causal connection between his race and [the difference in pay]." *Flowers*, 803 F.3d at 1338. An employer may pay an employee less money "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). Other than his disagreement with Mr.

Pugh's stated reasons for paying Mr. McDonald a higher salary, Mr. McGuire points to no evidence in the record contemporaneous with the setting of his salary when G4S hired him that is probative of intentional race discrimination with respect to his pay. Mr. McGuire has not linked his disagreement with a discriminatory motive. *See Flowers*, 803 F.3d at 1339 ("The burden placed on Title VII plaintiffs to produce additional evidence suggesting discrimination after contradicting their employer's stated reasons is not great, but neither is it nothing."). Accordingly, G4S is entitled to judgment as a matter of law on Mr. McGuire's Title VII discriminatory pay claim.

## B.  Retaliation

Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge . . . under [Title VII]." 42 U.S.C. § 2000e-3(a). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). The same holds true for retaliation claims under § 1981.

### 1.  Mr. McGuire's Prima Facie Case

"To establish a prima facie case of retaliation under Title VII, 'the plaintiff must show (1) that []he engaged in statutorily protected expression; (2) that []he suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)).

### a.     Statutorily Protected Expression

Mr. McGuire alleges that he engaged in two types of statutorily protected activity. First, on August 13, 2015, he asked his Caucasian supervisor why G4S was paying a new Caucasian area supervisor $4,440 more than G4S was paying him (Mr. McGuire). Second, on August 17, 2015, Mr. McGuire filed an EEOC charge of race discrimination. Filing a charge of discrimination with the EEOC is a statutorily protected activity. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).[13] Title VII's protections "extend to those who voice informal complaints as well." *Furcron*, 843 F.3d at 1311; *see also Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) ("voicing complaints of discrimination to [] supervisors" constitutes protected

---

[13] Mr. McGuire also filed an EEOC charge on December 18, 2015 after G4S terminated his employment. (Doc. 18-45). Although this also constitutes protected activity, Mr. McGuire does not allege that G4S retaliated against him for filing the December 18, 2015 charge. (*See generally* Doc. 22, pp. 22-24).

activity). Therefore, when Mr. McGuire inquired about the pay discrepancy and when he filed his EEOC charge, he engaged in statutorily protected activity.

### b. Adverse Employment Action

Next, Mr. McGuire "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation marks omitted)). Here, Mr. McGuire alleges that G4S retaliated against him by suspending him from August 17, 2015 until August 21, 2015, placing him on a PIP, and terminating his employment on December 18, 2015.

An adverse employment action for purposes of Title VII's anti-retaliation provision includes termination but "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington*, 548 U.S. at 64; *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (recognizing that termination of employment constitutes materially adverse employment action for purposes of retaliation claim). "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington*, 548 U.S. at 68. Here, G4S suspended Mr. McGuire with pay within days of his complaints about discriminatory pay. The company then placed him on

a 90-day PIP and ultimately fired him after he filed an EEOC charge of racial discrimination.[14] The Court finds that G4S's conduct would deter a reasonable employee from making or supporting a charge of discrimination.

### c. Causal Connection

"To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta*, 213 F.3d at 590. "'Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action.'" *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) (quoting *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010)). Mr. McGuire has satisfied this standard with respect to his suspension and G4S's decision to place him on a PIP. Mr. Pugh was aware that Mr. McGuire complained about a perceived racially-motivated pay disparity before Mr. Pugh suspended Mr. McGuire and before Mr. Pugh placed Mr. McGuire on a PIP. In addition, Mr. McGuire has demonstrated a causal

---

[14] Even if Mr. McGuire's suspension alone does not constitute an adverse employment action, Mr. McGuire's suspension sparked a series of events that ultimately led to his termination, and termination is an adverse employment action. *Shannon*, 292 F.3d at 716 (even if some acts of which the plaintiff complained "might not have individually risen to the level of adverse employment action under Title VII, when those actions are considered collectively, the total weight of them does constitute an adverse employment action.") (internal quotations and citation omitted).

connection between his complaint about disparate pay and his suspension and PIP given the temporal proximity between his complaint and his suspension and PIP. Mr. Pugh suspended Mr. McGuire just four days after he complained that G4S offered to pay Mr. McDonald more money for the same job, and Mr. Pugh placed Mr. McGuire on a PIP 15 days after Mr. McGuire's complaints. This temporal proximity is "sufficient to establish an inference of retaliation." *See Brown v. Ala. Dep't. of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010).

The causal connection between Mr. McGuire's complaints of discriminatory pay, his filing an EEOC charge in August 2015, and his termination in December 2015 is more tenuous. Although Mr. Pugh was aware of Mr. McGuire's protected activity when Mr. Pugh terminated Mr. McGuire's employment, the four month gap between the protected activity and Mr. McGuire's termination standing alone is too remote to suggest an inference of retaliation. *Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough.") (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (internal citations omitted); *see also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n the absence of any other evidence tending to show causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation.").

But Mr. McGuire has presented other evidence that would permit a fact-finder to determine that G4S fired him because he complained about discriminatory pay and filed an EEOC charge. The same evidence discussed below, at pages 33-35, is sufficient to create a question of fact regarding causal connection. Therefore, Mr. McGuire has established a prima facie case of retaliation.

### 2.    Non-Discriminatory Reason

"Once a *prima facie* case has been established, the [employer] may come forward with legitimate reasons for the employment action to negate the inference of retaliation." *Furcron*, 843 F.3d at 1310 (internal quotation marks and citation omitted) (alteration in *Furcon*). G4S contends that it suspended Mr. McGuire after it received complaints from employees alleging that Mr. McGuire was "very rude," "highly unprofessional," and "hostile." (Doc. 18-46, ¶ 25). G4S states that it terminated Mr. McGuire's employment based on his continued inappropriate and unprofessional behavior in managing his employees and interacting with his peers. (Doc. 18-46, ¶ 39). On their face, these are non-retaliatory reasons for suspending Mr. McGuire and terminating his employment.

### 3.    Pretext

Because G4S articulated non-retaliatory reasons for Mr. McGuire's suspension and termination, to survive summary judgment, Mr. McGuire must

show that the G4S's proffered reasons are "pretext to mask [retaliatory] actions." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009); *see also Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" (quoting *Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)). On the summary judgment record before the Court, the Court finds that Mr. McGuire has put forward sufficient evidence to create a genuine issue of material fact concerning pretext.

With respect to Mr. McGuire's suspension, one day after Mr. McGuire complained to Mr. Pugh, Ms. Vandiver told Mr. McGuire that Mr. Pugh and Ms. Warf were "in a closed-door meeting" and that he probably would be "terminated or suspended because [he] questioned [Mr. Pugh] about the guy in Huntsville." (Doc. 18-3, p. 58). Three days later, Mr. Pugh suspended Mr. McGuire. (Doc. 18-3, pp. 15, 19-20, 39-41, 54-56). This is strong circumstantial evidence that G4S suspended Mr. McGuire not because the company received complaints but because Mr. McGuire complained of discriminatory pay.

In addition, the complaints upon which G4S based Mr. McGuire's suspension and the PIP are dated in the days immediately following Mr. McGuire's

inquiry about the salary discrepancy, and there is evidence that at least one of the complaints was solicited. Moreover, a number of complaints upon which Mr. Pugh and G4S based Mr. McGuire's suspension concern events that took place weeks and months before the suspension. For example, Mr. Chandler complained about Mr. McGuire's performance "[w]hen [Mr. McGuire] first started" work at G4S. (Doc. 18-22, p. 1). In his email, dated two days after Mr. McGuire's suspension, Mr. Chandler stated that he was responding to Mr. Pugh's question about whether Mr. Chandler had "any issues" with Mr. McGuire. (Doc. 18-22, p. 1). From this evidence, a reasonable juror could infer that G4S suspended Mr. McGuire because he complained to Mr. Pugh about discriminatory pay, and G4S attempted to build a paper record that would justify the employment action.

In addition, evidence relating to Mr. McGuire's suspension indicates that G4S contemplated terminating Mr. McGuire close in time to his inquiry about the salary discrepancy. For example, when Mr. McGuire returned from his suspension, Mr. Pugh told him that he (Mr. Pugh) thought that Mr. McGuire would return to work from his suspension with "an angry black man attitude" and that he (Mr. Pugh) "had planned to fire" Mr. McGuire. (Doc. 18-3, p. 65; Doc. 18-6, p. 6). Mr. McGuire's August 20, 2015 employee disciplinary/corrective action notice states that Mr. McGuire is being discharged. (Doc. 18-24, p. 1). After Mr. McGuire filed his EEOC charge of discrimination on August 17, 2015, G4S asked

Mr. McGuire to return to work instead. Viewing the evidence in the light most favorable to Mr. McGuire, G4S changed its plans to terminate Mr. McGuire after he filed his EEOC charge. The company placed Mr. McGuire on a PIP but then failed to comply with its obligations under the PIP. G4S terminated Mr. McGuire when the PIP expired. (Doc. 18-34, p. 1; *see* Doc. 18-34).

Although G4S did not officially terminate Mr. McGuire's employment until December 18, 2015, Ms. Warf signed the employee personnel action form regarding Mr. McGuire's termination on October 21, 2015. (Doc. 18-43, p. 1). October 21, 2015 is one day after G4S officially responded to Mr. McGuire's initial EEOC complaint in which he contended that G4S paid him less money than Mr. McDonald. (Doc. 18-47; *see also* Doc. 18-30). From this evidence, a trier of fact could reasonably infer that G4S intended to terminate Mr. McGuire for his complaints of discriminatory pay, not because the company received grievances from employees about Mr. McGuire.

Accordingly, G4S is not entitled to summary judgment on Mr. McGuire's retaliation claim.

### C. After-Acquired Evidence

G4S seeks summary judgment on Mr. McGuire's request for reinstatement, front pay, and back pay based on after-acquired evidence that Mr. McGuire falsified his job application and a mileage report for the week of September 9

through September 13, 2015.  (Doc. 19, p. 22).[15]  The doctrine of after-acquired evidence is an affirmative defense on which G4S bears the burden of proof.  *See Holland v. Gee*, 677 F.3d 1047, 1065 (11th Cir. 2012).

In *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352 (1995), the Supreme Court held that if, during the course of litigation, an employer learns of after-acquired evidence of wrongful conduct during employment that would have resulted in termination of the employee, an employee who prevails on an age discrimination claim is not entitled to reinstatement or front pay, and back pay is calculated from the date of the unlawful employment action to the date the employer discovered the new information.  513 U.S. at 361-63.  The Eleventh Circuit has extended the after-acquired evidence rule to cases involving Title VII claims.  *Wallace v. Dunn Const. Co., Inc.*, 62 F.3d 374, 378 (11th Cir. 1995).  In *Wallace*, the Eleventh Circuit held that "the after-acquired evidence rule announced in *McKennon* applies to cases in which the after-acquired evidence concerns the employee's misrepresentations in a job application or resume, as well as cases in which the after-acquired evidence relates to employee wrongdoing during employment."  *Wallace*, 62 F.3d at 379.

---

[15] Mr. McGuire seeks front pay and back pay.  (*See* Doc. 1, p. 9, ¶ 3).  The Court has not located a specific request for reinstatement in Mr. McGuire's complaint.  In his complaint, Mr. McGuire requests generally that the Court "[a]ward such other relief and benefits as the cause of justice may require."  (Doc. 1, p. 8, ¶ 5).  To the extent that this request encompasses a claim for reinstatement, the analysis below applies to the request.

To benefit from the after-acquired evidence rule, G4S must "establish that the wrongdoing was of such severity that [Mr. McGuire] in fact would have been terminated on those grounds alone if [G4S] had known of it at the time of the discharge." *McKennon*, 513 U.S. at 362-63 (1995). G4S has met its burden of demonstrating that the company would have terminated Mr. McGuire's employment for providing false information on his application. Mr. McGuire admits that his application states that he has an Associate's Degree when in fact he does not. (Doc. 18-2, pp. 16-18). In his affidavit, Mr. Pugh stated that had he known that Mr. McGuire falsified his application, then Mr. Pugh would have terminated Mr. McGuire's employment. (Doc. 18-46, ¶ 45). Mr. McGuire has not offered evidence that contradicts Mr. Pugh's testimony on this point.[16] Mr. Pugh's testimony is consistent with an acknowledgement that appears at the bottom of the

---

[16] The Court is not persuaded by Mr. McGuire's argument that the Court should not credit Mr. Pugh's testimony because he is an interested witness. (Doc. 22, p. 13). "[U]nder Rule 56, a party may support a motion for summary judgment with, among other things, affidavits or declarations, and there is no requirement that these sworn statements be from disinterested witnesses." *Woods v. Delta Air Lines Inc.*, 595 Fed. Appx. 874, 879 (11th Cir. 2014) (citing Fed. R. Civ. P 56(c)(1)(A), (c)(4) and Fed. R. Evid. 601). The Eleventh Circuit recently held that "[a] non-conclusory affidavit which complies with Rule 56 can create a genuine issue of material fact, even if it is self-serving and/or uncorroborated." *United States v. Stein*, 881 F.3d 853, 858-59 (11th Cir. 2018). The Court would find a question of fact with respect to whether G4S would have terminated Mr. McGuire had G4S known about the falsified application if Mr. McGuire had submitted an affidavit disputing Mr. Pugh's testimony. Because Mr. McGuire has not presented evidence to contradict Mr. Pugh's testimony that he would have fired Mr. McGuire if he had known that Mr. McGuire provided false information on his application, the Court must credit G4S's undisputed evidence for purposes of summary judgment.

application form that Mr. McGuire completed. The acknowledgment states, "I understand that any misrepresentation, falsification or omission of this application shall be sufficient reason for refusal or dismissal of my employment." (Doc. 18-9, p. 4). Therefore, G4S has demonstrated that the company would have terminated Mr. McGuire's employment when it learned of his misrepresentation on his job application. *See Wallace*, 62 F.3d at 380.[17]

Accordingly, should Mr. McGuire prevail on his retaliation claim, he may not seek reinstatement or front pay. *Wallace*, 62 F.3d at 380. Absent an adjustment by the Court to account for "extraordinary equitable circumstances that affect the legitimate interests of either party," Mr. McGuire's back pay will be limited from December 18, 2016 until the date that G4S discovered that Mr. McGuire provided false information on his application. *Wallace*, 62 F.3d at 380.[18]

---

[17] Because the Court finds that G4S has met its burden of establishing that the company would have terminated Mr. McGuire's employment for falsification of his application, the Court does not examine the after-acquired evidence issue with respect to the alleged falsified mileage report. The Court notes for the record that Mr. McGuire has created a question of fact with respect to the mileage report because he testified that he did not falsify his mileage reports while he worked for G4S. (Doc. 18-4, p. 81).

[18] In *McKennon*, the Supreme Court advised that if a defendant demonstrates that it is entitled to the after-acquired evidence defense, "[t]he beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." *McKennon*, 513 U.S. at 362. The Supreme Court also instructed that "[i]n determining the appropriate order for relief, the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party." *McKennon*, 513 U.S. at 362. At this stage, the Court makes no findings with respect to whether equitable interests might bear on the calculation of back pay should Mr. McGuire prevail at trial.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** G4S's motion for summary judgment (Doc. 19).

The Court enters judgment as a matter of law in favor of G4S on Mr. McGuire's Title VII pay discrimination claim. The Court **DISMISSES** that claim **WITH PREJUDICE**.

The Court **DENIES** summary judgment with respect to Mr. McGuire's Title VII retaliation claim.

The Court **ENTERS** judgment as a matter of law in favor of G4S on its after-acquired evidence defense.

The Court **SETS** Mr. McGuire's Title VII retaliation claim for a jury trial at **9:00 a.m.** on **Tuesday, August 14, 2018**. By separate order, the Court will provide the parties will pre-trial instructions.

**DONE** and **ORDERED** this March 8, 2018.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE